In the matter of the Proprietors of the New South Meeting-House in Boston.*

This court will not decree the dissolution of a religious corporation, and the distribution of its property among its members, against the protest of a minority, if it holds real estate and funds given in trust for building a church for the public worship of God; especially upon proof simply that the society is in an unprosperous condition, and that it will be inexpedient to continue to occupy the present church edifice as a place of public worship

In 1715, land was granted by the town of Boston for the erection thereon "of an edifice for a meeting-house for the public worship of God," to be held by the grantees and " their associates and successors for the use aforesaid forever." Funds were contributed by individuals, who did not become members of the society or proprietors of pews, but who were induced to subscribe from a desire "to forward so good a work." The meeting-house was accordingly built, and the proprietors were recognized as a religious corporation by a statute passed in 1803. *Held*, 1, that this court have no power, by statute or otherwise, to decree a dissolution of such corporation, and authorize a sale of its property and a distribution of the avails thereof among its members, against the protest of a minority of the members; 2, that, if this court had such power, it would not be reasonable to exercise it simply on proof that the society is in an unprosperous condition, and that it will be inexpedient to continue to occupy the present church edifice as a place of public worship.

* This case and the following one were argued in March 1867.

PETITION filed on the 24th of February 1866, under Gen. Sts. *c.* 68, § 35, by a majority in number and interest of the members of a corporation, confirmed and established by *St.* 1803, *c.* 56, called " The Proprietors of the New South Meeting-House in Boston," setting forth that said corporation owns certain land and a meeting-house thereon in Boston ; that it has become much diminished in numbers, and owes a large sum of money which it has no present means of paying ; that its annual expenses exceed its revenues, and there is no prospect of any improvement in this respect ; and that at a meeting of the proprietors, duly called, on February 13th 1866, it was voted to apply to this court for the dissolution of the corporation ; and praying that the corporation might be dissolved, and a receiver of its property and assets be appointed, who might sell the real estate, and distribute the proceeds, after payment of debts and expenses, among the members.

A minority of the members of the corporation filed an answer denying that the corporation has no means of paying its debt, and averring that by proper management all the debts might be paid, and an income obtained sufficient for all its expenses ; representing that the corporation is a public religious society or corporation, and not such a corporation as can be dissolved by a decree of this court, upon petition of a majority of the members thereof ; that it was incorporated as and for a perpetual corporation, and for the purpose of maintaining forever the worship of God and the teaching of the Christian religion ; that all the proprietors of pews bought them upon the understanding and agreement that the property of said religious society should be used for the above purposes, and no other, and they paid for and obtained no rights of ownership in the property of the corporation which entitled a majority of them to petition for a decree of dissolution of the corporation, a sale of all its property, and a distribution of the proceeds among those who may be proprietors of pews ; that more than half of all the pews have become the property of the society ; that these pews, if offered for sale upon the understanding that the society was to be preserved and continued for the purposes of its incorporation

could be sold for a sum of money which would pay all debts of the corporation, and the reasonable assessments laid upon the pews would give an income sufficient to meet all expenses; and that the present meeting-house was erected by the society in a time of great pecuniary embarrassment, by the liberality and benevolence of pious men, who trusted and believed that they were aiding in making provision for the permanent worship of God, and had no intention of giving property to the society for purposes of profit and speculation to the proprietors of pews in after years.

The deacons of the church also filed an answer, setting forth that Sarah Preston of Dorchester, by her will proved in 1813, bequeathed the residue of her estate to the deacons of said church, and their successors in office forever, in trust, that the income of the same should be added to the collections which might be made at the quarterly charity lecture in Boston, and appropriated forever to the relief of the poor and destitute in the same manner and at the same time as said collection might be distributed; that the quarterly charity lecture is an old, established and well known service, at which a sermon is preached by one of the ministers of certain Congregational parishes in Boston, and a contribution taken up, which is divided among the poor of those parishes, and that the testatrix by her will founded a charitable trust for the relief of the poor, of which the deacons of this church were forever to be the trustees; that they accepted said trust, and have ever since duly administered said charity, and the fund now amounts to over $17,000; and they prayed that, in any decree which might be made, the rights of said public charity might be preserved.

The truth of the facts stated in the answer was admitted; and the case was reserved for the determination of the whole court, by *Gray*, J., upon the petition, answers, and certain other facts which appear in the opinion.

*S. Bartlett & L. Shaw*, for the petitioners. The Gen. Sts. *c.* 68, § 35, authorize this court to dissolve all corporations, for reasonable cause. There is no exception in favor of religious corporations. By the common law, there were certain modes ✦·

which corporations might be dissolved; but these were inade-quate, in a community like ours. The statute referred to addeᴅ another, with the obvious intent of providing a well defineᴅ mode of dissolution, under judicial sanction and protection. *Treadwell* v. *Salisbury Manuf. Co.* 7 Gray, 393–406. *Easterbrooks* v. *Tillinghast*, 5 Gray, 17. *Oakes* v. *Hill*, 14 Pick. 442. *Revere* v. *Boston Copper Co.* 15 Pick. 351–360. To hold that a religious corporation can never be dissolved involves an absurdity. Like all human things, it may and must at some time cease to exist. And when this time comes, it is eminently proper that the fact should be ascertained and settled by judicial process, under which all rights can be protected. By Gen. Sts. *c.* 30, § 1, religious corporations have the powers given to other corporations by Gen. Sts. *c.* 68, which include the power of being dissolved.

Upon the construction contended for by the respondents, the necessary result would be that, under all contingencies that may befall religious societies, their property is inalienable, except for the purpose of continuing their existence, even by unanimous consent of all possible interests. This theory must rest upon the ground that incorporated religious societies are public corporations, whose duties are perpetual and of a character to be enforced by *mandamus* or other process by the Commonweath, or they are corporations whose faculty is, by the terms of their creation, limited to the acquisition and holding of property in a fixed locality, for a defined use, and with no power of disposition for their own or other uses, should that use fail. But there is no warrant for either of these views in the legislation or judicial decisions of this state, but the contrary. See *St.* 1851, *c.* 161; Gen. Sts. c. 29, § 12; *Easterbrooks* v. *Tillinghast*, 5 Gray, 17; *Wiggin* v. *Freewill Baptist Church*, 8 Met. 301; *Ladd* v. *Clements*, 4 Cush. 476; *Attorney General* v. *Merrimack Manuf. Co.* 14 Gray, 586. Religious corporations are not public charities. *Attorney General* v. *Trinity Church*, 9 Allen, 422. *Attorney General* v. *Federal Street Meeting-House*, 3 Gray, 1. *Parker* v. *May*, 5 Cush. 350. And the property of such corporations is not inalienable. Otherwise, all church mortgages would be

absolutely void. But this is settled to the contrary, by implica-tion, in *Commonwealth* v. *Smith*, 10 Allen, 448. And so a creditor could not attach and sell church property for a debt of the cor-poration ; unless there is a distinction between a voluntary and nvoluntary alienation.

The real question is, whether religious corporations are of a *quasi* public nature, and therefore incapable of having their property alienated from its original use. What are *quasi* public corporations ? Railways, canals, possibly banks. Religious corporations do not fall within this class.

If the court have power to decree a dissolution, reasonable cause has been shown in this case. The concurrent testimony of a great majority of the proprietors should have great weight. There has been a steady falling off in the number of the pro-prietors, and of persons who hire pews ; and a constantly in-creasing debt. The meeting-house is now closed and out of repair. There is no prospect of an improvement in the con-dition of things.

It is no sufficient answer to this petition to show that, by removing the location of the church, another body of people, entirely distinct from the existing members of the corporation, could be got together who would be willing to take the property and devote it to some species of public worship at some place within the limits of Boston. Why should this body of people be compelled to submit to this, instead of individually uniting themselves with such other religious societies as they may pre-fer ? The corporation should not be compelled to try the experi-ment of prolonging its existence in another locality.

Nor is it any answer to say that this corporation has been aided by donations, made in the faith that it would continue a religious society, and would not, by a dissolution, distribute its property, including these gifts, among its proprietors. If the right to dissolve is a legal right, the donors, unless there be some limitation or condition attached to their gifts, must be deemed to have contemplated all lawful dispositions of the same. *Rawson* v. *School District in Uxbridge*, 7 Allen, 125.

*J. A. Andrew & C. H. Hill*, (*G. O. Shattuck* with them,) for

the respondents. The Gen. Sts. *c.* 68, § 35, do not apply to religious societies. Parishes and religious societies in Massachusetts are in some respects *sui generis,* and have been greatly affected by local laws and usages. They have in some respects a *quasi* public character. *Taylor* v. *Edson,* 4 Cush. 525. *Goddard* v. *Smithett,* 3 Gray, 120. They are protected and favored by the constitution and by special statutes. Dec. of Rights, art. 3. Gen. Sts. *c.* 29, § 12; *c.* 30, §§ 20–23. The general language of Gen. Sts. *c.* 68, § 35, should be limited in its application to corporations established for trading purposes. For other instances of such limitation of general language, see *Dwight* v. *Mayor, &c. of Boston,* 12 Allen, 316; *Humphrey* v. *Berkshire Woollen Co.* 10 Allen, 420; *Goddard* v. *Smithett,* 3 Gray, 120; *Commonwealth* v. *Hartnett,* Ib. 450; *Staniels* v. *Raymond,* 4 Cush. 314. The rights of pew-holders are of a limited and peculiar character, and are in the nature of an easement. *Jackson* v. *Rounseville,* 5 Met. 127. *Attorney General* v. *Federal Street Meeting-House,* 3 Gray, 45. *Taylor* v. *Edson,* 4 Cush. 522. *Fassett* v. *First Parish in Boylston,* 19 Pick. 361. *Gay* v. *Baker,* 17 Mass. 435. Gen. Sts. *c.* 30, §§ 35, 37. A statute designed for trading corporations is not applicable to a corporation of this character. The members of this corporation have no interest whatever, as owners, in the corporate property. By common law, on the dissolution of a corporation, the real estate reverts to the grantors and the personalty to the crown; and this rule has never been changed as to ecclesiastical corporations. 2 Kent Com. (6th ed.) 307, *note.* Angell & Ames on Corp. § 779 *a.* The grant of land from the town of Boston in 1715 was in trust for the support of divine worship. See *Baker* v. *Fales,* 16 Mass. 495; *Sohier* v. *St. Paul's Church,* 12 Met. 259. And in all religious societies, the property is held in trust for pious purposes, and not for the pecuniary benefit of the members. *Attorney General* v. *Federal Street Meeting-House,* 3 Gray, 58. There is no decision in Massachusetts that such property can be appropriated, against the protest of a minority, to other uses.,

But if the court has jurisdiction, there is no sufficient cause to dissolve this corporation. The des`-e of a majority even of ɛ

trading corporation is not conclusive upon the court. *In re Niagara Ins. Co.* 1 Paige, 258. But the law of the life of a religious corporation is different from that of a trading corporation. The argument of the petitioners is that the society is not in a prosperous pecuniary condition. But this is no reason at all for the dissolution of such a corporation. At the outset, land was given by the town, not without consideration, but without pecuniary consideration. Afterwards, in 1815, by a new subscription, the most expensive church then in Boston was built. Fifteen pews were reserved for the poor. What claim have these petitioners to pervert to private use these pews, consecrated to the poor, on that soil, unbought by money? They do not ask the court to see that the money derived from the sale is devoted to some charity. If this church is sold and the proceeds divided, to what extent may not the precedent be carried? The petitioners are unwilling by themselves to endeavor longer to maintain the ordinances of Christianity by means of this corporation, and are unwilling to receive new associates by a general sale of the pews of the society. But they have no right thus to refuse. If they will not elect their own associates, they should allow the city of Boston to do it for them.

There are two ways by which the original object can be secured. 1st. The pews may be sold, and a new edifice erected elsewhere. 2d. The church may remain where it now stands, all the unoccupied pews may be devoted to the poor, and a free church may be established for the vast and growing class of uninstructed poor in that neighborhood, to whom it would be an infinite benefit for coming generations. " I deeply feel," said Mr. Andrew, " the importance of this suggestion, aside from my interest as counsel in this cause."

Bigelow, C. J. The questions involved in the decision of this case have been very fully and ably discussed before us by the learned counsel of the respective parties. We have held them under advisemen. for several months, not because we have entertained any serious doubts as to the result to which it would be our duty ultimately to come, but in order that time and opportunity might be afforded us to form our conclusions after the most careful and deliberate consideration.

The object of the present proceeding is to obtain a decree of this court dissolving a corporation, established as a parish or religious society in Boston. By virtue of our inherent powers as a court of law, or in the exercise of a general chancery jurisdiction, we have no authority to pass such a decree, except in case of an abuse of corporate powers on a proceeding for the forfeiture of a charter. By the rules of the common law, the only modes in which the existence of a corporation could be terminated were by act of the legislature, by the death of all the corporate members, by a forfeiture of the franchise, or by a surrender of the charter to the government. But by Gen. Sts. *c.* 68, §§ 35–39, which is a reënactment of *St.* 1852, *c.* 55, authority was vested in this court to decree a dissolution of a corporation for reasonable cause on the application of a majority in number or interest of its members. It is under this statute that the present proceeding is brought. It is resisted by a minority of the members upon two grounds: first, that the provisions of the statute do not embrace corporations of the class to which the one which is the subject of the present proceeding belongs; and, secondly, that if the statute is broad enough to confer a jurisdiction which will authorize the court to take cognizance of the present application, no sufficient reason is shown by the petitioners to warrant us in granting their request.

To enable us to arrive at satisfactory conclusions on these points, it is important to have in mind a clear idea of the nature of the corporation of which the petitioners are members, and of the relation which they, as members, sustain towards the corporate body. From the facts disclosed concerning the origin and history of the corporation, it appears that an association was formed more than one hundred and fifty years ago for the purpose of erecting a meeting-house or church edifice in the town of Boston, and of supporting and maintaining in connection therewith the public worship of God and the usual rites and ordinances appertaining to a Protestant Christian society or parish. In the mode of its organization and in the management of its affairs, both secular and religious, it seems to have been in most respects like other religious societies previously existing

and subsequently established in Boston prior to the Revolution.
It began as a voluntary association of persons uniting them-
selves together to form a congregation of worshippers. After-
wards it took on itself the forms of a corporate body. It held.
regular meetings for the transaction of business and for the
choice of parish officers, raised money by votes for the support
of the ministry and for parochial charges, kept a record of its
proceedings, and generally conducted its affairs as if legitimately
clothed with corporate powers. These were probably originally
assumed without any express legal authority, in conformity to
the usage then existing in similar societies in Boston. Subse-
quently by the provincial statute of 28 Geo. II. *c.* 9, Anc. Chart.
607, societies thus created and established were to a certain ex-
tent vested with limited corporate rights and privileges. In the
year 1803 the legislature of the Commonwealth passed an act
(*St.* 1803, *c.* 56,) "declaring and confirming the incorporation
of the proprietors of the New South Meeting-House," which
seems to recognize that they had previously been in the exercise.
and enjoyment of certain powers and privileges as an incorpo-
rated society. Upon examination we do not find that there was
anything peculiar in the origin and formation of this society to
distinguish it from other associations established for similar
objects in the town of Boston during the first century and a
half after the settlement of the colony, unless it be in the mode
in which a portion of the funds necessary to erect the house for
public worship for the use of the society was raised, and the
grant of the land on which it was built was obtained. It ap-
pears that the individuals who originally associated themselves
together to form this society and build the meeting-house did
not rely solely on their own contributions for the accomplish
ment of their purpose. They solicited and received pecuniary
aid from other persons who did not become members of the
society or proprietors of pews, but who were induced to sub-
scribe from a desire to "forward so good a work." The funds
so raised and contributed were expended solely for the erection
of a house of worship. The land on which it was placed was
obtained without price by a voluntary grant from the town, by

indentures bearing date November 21, 1715, of the parcel on which the present edifice of the proprietors stands, the same being, by the terms of the grant, conveyed for the erection thereon " of an edifice for a meeting-house for the public worship of God, provided the same be erected and improved to that use within three years," the premises to be held by the grantees and " their associates and successors for the use aforesaid forever."

This summary of the history of the origin, organization and continued existence of the society or parish of which the present corporation is the legitimate successor and representative, indicates very clearly the character of the association, the legal rights and incidents which attached to it, the tenure by which its property was held, and the nature and extent of the interest which belonged to the members or owners of pews in the church edifice. It is unnecessary to go into a detailed examination of all these points. Most of them have been considered and adjudicated by this court in *Attorney General* v. *Proprietors of Federal Street Meeting-House*, 3 Gray, 35–41. The society, being originally formed as a voluntary association without corporate powers, could not take a title to real estate in a collective capacity. The fee of the land with the buildings thereon was, therefore, originally vested in a few individuals, themselves contributors to the funds and members of the society, who held it in trust for the uses and purposes for which the society was organized, in like manner and to the same effect as a corporation of a territorial or poll parish would hold parochial property.

The nature of this trust is to be gathered from the manifest views and intentions entertained by the originators and founders of the society and by the contributors towards its funds, as shown by the facts and circumstances already stated, which were attendant on its organization and the acquisition of its property, in connection with the declared use to which the real estate was conveyed by the town of Boston. Certainly, there is no ground for supposing that the trust was created for the private pecuniary advantage or gain of the individual members of the society. The object to be accomplished and perpetuated was a much higher

one. It was to establish a permanent religious society for the public worship of God, with all the incidents, rights and privileges which, according to the usage and practice in this commonwealth at that period of time, appertained to such bodies. The support of public worship was then deemed not only a religious and moral duty, but also a civil obligation which every citizen was bound to fulfil by contributing his share towards the maintenance of parishes and religious societies, and of public teachers of religion and piety in connection therewith. This principle was subsequently embodied in the third article of the Declaration of Rights in the constitution of the Commonwealth. This close and intimate connection in the early period of our history between civil and religious rights and duties tended to give to ancient parishes and societies established for the support of public worship a somewhat peculiar character. They can hardly be regarded as having been institutions of an exclusively private character, in the maintenance of which the members or pewholders were alone interested. Although not technically charitable, because not founded exclusively on donations or voluntary gifts, or intended for the use and benefit of a class of persons so uncertain and indefinite as to be incapable of asserting and vindicating their equitable rights, they were nevertheless established for pious uses, and in furtherance of objects which were considered to be so nearly akin to those which appertained to the citizen in his civil capacity as a subject of government, that parishes and religious societies have always been deemed to possess a *quasi* public character, which distinguishes them from ordinary private corporations. They are exempted from state and municipal taxes. Gen. Sts. *c.* 11, § 5. They are intrusted with the power of imposing taxes on the polls and estates of their members, and collecting the same by warrant of distress in the same manner as towns; Gen. Sts. *c.* 30, §§ 20–23; and they are subject to direction and control by writ of *mandamus*. *St. Luke's Church* v. *Slack*, 7 Cush. 226. It was probably in part on this view of the nature of the powers and duties vested in such bodies, that in the case of *Goddard* v. *Smithett*, 3 Gray, 120, a strong intimation of an opinion was made, that they

could not be regarded as private corporations in such sense as to be subject to an information in the nature of *quo warranto* under *St.* 1852, *c.* 312, § 42.

But a much more important consideration bearing on the nature of the trust originally vested in the trustees, and by succession in the corporation, arises when we take into view the rights and interests of the immediate *cestuis que trust* in the real estate and property held for the use of the society or parish. No doubt the persons who associated themselves together for the formation of the parish and the erection of the house of worship, and who contributed their own money and procured subscriptions from others, were in the outset entitled to the chief beneficial interest in and enjoyment of the trust property, and that subsequently the pew-holders succeeded to their rights. *Attorney General* v. *Proprietors of Federal Street Meeting-House,* 3 Gray, 45–47. But what were the nature and extent of this beneficial interest? As pew-holders they had no right or title in the real estate beyond a limited usufructuary interest, by virtue of which each holder had an exclusive right to occupy a particular portion of the church edifice at certain times for the special purpose of attending on public worship, and for the other customary uses to which such edifices may be properly appropriated. And this was the extent of the beneficial use or enjoyment which belonged to the pew-holders as such. They could in no just sense be held to be equitable owners of aliquot parts or shares in the property according to the number of pews held by each, because a right to a pew conferred a limited usufruct only, and not the entire beneficial interest in the property, such as belongs to stockholders in corporations established for pecuniary profit. But the pew-holders also became members of the society or parish, and by virtue of such membership had a right, according to the duly expressed will of a majority, to the control and management of the property. This, however, was not an absolute and unrestricted right. The entire *jus disponendi* was not vested in them. Their power was necessarily limited by the trusts for which the legal title was held. These they could not pervert or destroy by misappropriation of the property

Their right was restricted from the very nature of the trust to such direction and control of the affairs of the parish or society, both religious and temporal, as were calculated to subserve and duly administer the trust for which the property was held. But beyond this they could not legitimately act. The trust was not limited in time; it had for its object no temporary purpose; the property was devoted to a use in its nature likely to be perpetual; no power to revoke or annul the trust was reserved by implication. It would be plainly inconsistent with its manifest scope and purpose that the majority of the trustees or of the *cestuis que trust*, or of both united, should have the power to abrogate such a trust by diverting the entire property from the use to which it was dedicated, and converting it to purposes of private pecuniary gain.

This view of the nature of the trust which attached to property belonging to parishes and religious societies as anciently organized in the town of Boston is especially applicable to the corporation which is the subject of these proceedings. It did not owe its existence solely to the contributions of those who intended to become beneficial owners in the property as pew-holders or members. It was founded in part by donations from those who had no expectation of personal benefit or advantage, but who gave money for the special purpose of aiding in the erection of a house of worship for the use of a religious society, and by a voluntary grant of land from the town, conveyed on the express trust that it was to be appropriated to such purpose. It is difficult to see on what principle property so given and held can be justifiably taken and appropriated, either by a majority of the trustees or of the *cestuis que trust*, to a purpose wholly foreign from that for which it was originally intended to be used. Certainly no case was cited by the learned counsel for the petitioners, which lends any sanction to such a doctrine.

On examining the statute already cited, by which the incorporation of the proprietors of the New South Meeting-House was declared and confirmed, we can find nothing inconsistent with the views already stated concerning the trusts with which

the corporation is clothed, or the rights of the pew-holders and members as *cestuis que trust.* On the contrary, the provisions of that act are confirmatory of the rights of the respective parties in the corporate property as previously understood and acted on. The corporation is thereby declared to be seised of the meeting-house and land, not absolutely, but subject to the rights and interests of the several proprietors in their respective pews ; and it is also declared to be entitled to all the privileges and subject to all the duties which it had previously enjoyed or performed ; and it is especially noticeable that the powers expressly enumerated and granted by the act are confined to those which could be properly exercised in furtherance of the trust reposed in a corporation holding property for the support of public worship, and for purposes necessarily and properly incidental thereto. We look in vain for any provision which authorizes, even by implication, an alienation of the property by the act of the majority for purposes foreign to those for which it was held by the corporation, with a view to its appropriation for purposes of private gain, or a distribution of it into shares by which the owners of pews are made stockholders, entitled to the whole beneficial use of the property, discharged of all trusts. The whole scope and purpose of the act are to establish and confirm in the corporation the rights, privileges and attributes of a parish and religious society, with power to hold and administer the property for the special use of supporting and maintaining public worship, and exercising the functions appertaining to such use. The power of the proprietors acting by a majority, in this as in all other corporations, is limited to matters properly embraced within the purposes for which the corporation was created. *Durfee* v. *Old Colony & Fall River Railroad,* 5 Allen, 242.

So far as this corporation is subject, if at all, to the provisions of the general laws regulating the powers and rights of the members of parishes and religious societies over the real estate on which their houses of worship are erected, it would seem to be clear that the majority of the members derive no authority from them to make an absolute alienation of the estate, discharged of

the use to which it had been dedicated, with a view to appropriate it to other and different purposes. By Gen. Sts. *c.* 30, §§ 35, 36, the proprietors are authorized to sell their house already built only in case it becomes necessary to alter, enlarge, repair, or remove it, or to build a new one. The enactment of a provision conferring such powers carries with it a strong implication that without it such a limited authority, and *a fortiori* a larger one of similar character, did not exist.

We are not prepared, nor is it necessary for the purpose of this discussion, to determine the precise limits of the powers of the majority of the proprietors in the management and disposition of this trust property, nor do we intend to decide what would be the effect of an unanimous consent of all persons interested in the trust to terminate it, and to appropriate the property to a new and different use. It is sufficient for the present inquiry to say, that a majority of the proprietors are not clothed with authority sufficiently broad to warrant them in wholly relinquishing their trust, and diverting the property to the private use of the several proprietors or pew-holders.

We have gone somewhat fully into a consideration of the nature of the powers and duties appertaining under the laws of this commonwealth to ancient parishes and religious societies, especially those organized in the town of Boston prior to the beginning of the present century, because the conclusions to which our minds have been led on this subject have a strong bearing on both the questions which we are called upon to adjudicate in the case before us.

In the first place, in view of the peculiar nature of these corporations, and of the rights and interests of their members in the corporate property, we are not satisfied that this court has authority under the provisions of the statute to entertain jurisdiction of this proceeding. The general provision contained in Gen. Sts. *c.* 68, § 35, whence our authority and jurisdiction are derived, is expressed in very general terms, and, if construed by itself, without reference to the context and according to the letter only, is broad enough to include every species of corporations known to the law. It authorizes "a majority in number or

interest of the members of a corporation to apply for its dissolution." This language, taken by itself, might be held to embrace within its scope public corporations like towns or cities, those of a *quasi* public character like counties or school districts, and institutions created and established for the administration of public charitable trusts. But it is obvious that this literal construction would not subserve the intention of the legislature. It could not have been the design of the framers of the statute to clothe this court with so extraordinary a power, which in many cases would in its exercise partake more of a legislative than of a judicial character. Some limitation, then, is to be put on the language of the statute. In seeking to ascertain what this limitation is, the most obvious consideration which suggests itself is, that the legislature intended that the provision should be applicable only to private corporations, in which, by the terms of their charters, the corporate property is held under the entire control and management of the majority of the members, subject to no trusts, except that it is to be used for the purposes for which the corporation is created, according to their duly expressed wish, for the private and personal advantage or profit of the beneficial owners, or of such persons as they may designate and appoint, and to be disposed of absolutely in such manner as the majority may direct, whenever they shall deem a further continuance of the corporate business inexpedient or unnecessary. This construction would give a wide scope and operation to the provisions of the statute. It would embrace within its terms every corporation in which the members or proprietors, or a majority of them, have the absolute right to regulate and control the corporate property, and to direct its final disposition, either for their own benefit or that of their appointees or assigns, whatever may have been the use, whether secular, religious or charitable, to which it may have been previously held and appropriated. As applied to corporations so constituted, the provisions of the statute would not be inconsistent with any of the purposes for which they were established. Being in their nature strictly private, charged with no duties of a public character, except such as they may at any time voluntarily

relinquish, clothed with no trusts which they are bound to ad-
minister, holding property solely for the beneficial use of their
stockholders or members in whom the entire *jus disponendi* is
vested, which they can at any time exercise whenever they may
see fit to cease to transact business or to close the affairs of the
corporation, the power of a majority in number or interest to
apply for a dissolution of the corporation according to the pro-
visions of the statute is a convenient and salutary one, which
would not contravene public policy or tend to impair any right
or violate or infringe upon any trusts vested in or appertaining
to such corporations. Under the provisions of the statute, the
majority of the members or stockholders of corporations of this
description would acquire no substantial additional control over
corporate affairs and property other than that which belonged
to them under their charters. Prior to its enactment they had
authority to terminate the actual existence of these corporations
by ceasing to exercise the powers and privileges conferred on
them, as has been already determined in regard to trading and
manufacturing corporations. *Treadwell* v. *Salisbury Manuf.
Co.* 7 Gray, 393–404. The statute merely authorizes them to
make a formal surrender of their charters, with a view to the
extinction of their corporate powers, whenever the majority may
deem it expedient voluntarily to relinquish them. In proceed-
ings instituted for such a purpose by the class of corporations
already designated, no one would have any real interest, pecu-
niary or otherwise, except stockholders and creditors. The due
protection of their respective rights and the final adjustment of
the corporate business and the proper distribution of assets would
come quite within the ordinary range of judicial authority and
jurisdiction, in analogy to that exercised in the settlement of
the concerns of copartnerships to which corporations of the class
referred to bear so close a resemblance. It is therefore reason-
able to infer, construing this statute with reference to the subject
matter, that its provisions were intended to apply only to corpo-
ations established for purposes of private gain or benefit, or for
some specific object or purpose, and in which the corporate
property is vested, in definite shares or proportions, exclusively

in the stockholders or members, who, by the duly ascertained will of the majority in number or interest, have the right, not only to control and manage it, but to dispose of it absolutely for the use of themselves and their associate members. If a broader application is given to the statute, it is difficult to see where or how any line of demarcation can be drawn by which to separate those which come within and those that fall without the scope of its provisions. But in view of the results which might follow from the exercise of a general and unlimited power, upon the application of a majority of the members, to decree the dissolution of any and all corporations without reference to the nature of their powers and duties, it is impossible to suppose that so broad a jurisdiction was intended to be conferred on this court. An authority the exercise of which might operate to change the tenure of property, to annihilate trusts, and divert property to new uses foreign to those to which it was originally appropriated, to dissolve public corporations and religious and charitable institutions and declare them extinct, ought not to be derived from doubtful implication or by forced construction of language. Such it seems to us is substantially the power that the petitioners invoke in the present case. But, as it is not expressly given by the statute nor necessarily to be implied from its terms, the inference is just and reasonable that such extraordinary jurisdiction was not intended to be conferred.

This conclusion, derived from a consideration of the subject matter of the statute and the general purpose which it was designed to effect, is strengthened by a reference to some of the special provisions regulating the course of procedure under it. The power to apply to this court for a dissolution of a corporation is given only " when a majority in number or interest of the members desire to close their concerns." This seems to imply that the statute was intended to include only those corporations in which the powers and duties of the members are purely voluntary, to be exercised only at the will of a majority, and not to those charged with duties of a public nature or with the execution of trusts of a permanent and obligatory character. This construction fully satisfies the language of the statute, and gives

to its provisions an extensive and beneficial operation, while at the same time it avoids the conclusion that the legislature, under a general provision of this character, intended to effect an essential change in the constitution of corporations of the class last named, by giving to the majority a new power, by virtue of which they might cease to exercise corporate functions, and seek to cause corporations to be dissolved and trusts vested in them to be destroyed or perverted.

But a more decisive indication of the intent of the legislature is to be found in that provision which prescribes the disposition which is to be made of the corporate property when a decree of dissolution shall have been made in accordance with the statute. By § 39 it is provided that after payment of corporate debts the balance or surplus of the property of the corporation shall be paid and distributed " to and among those who are justly entitled thereto, as having been stockholders or members of the corporation." From what has been already said concerning the tenure on which property belonging to ancient parishes in Boston is held, and the qualified right which pew-holders or members of such corporations have in its enjoyment and use, it is clear that this provision is wholly inapplicable to them. Neither as pew-holders nor as members have they any absolute right to the corporate property. Membership results not from ownership of any definite share or aliquot part or proportion of the corporate property vested in each pew-holder, but from the qualified usufructuary interest which each has as proprietor of a pew. In a corporation so constituted, the members cannot be regarded as justly entitled to the corporate property, or as having any claim to receive to their own use any portion of it. In regard to all corporations having capital stock divided into shares which are owned by members, or having property the beneficial use and absolute right of disposal of which are vested in equal proportions in a body of proprietors, the provision of the statute requiring a division of the property among the stockholders or members is just and reasonable, in entire accordance with the tenure on which the corporation holds the property, and susceptible of practical application in conformity with the rights of the parties.

But no division or distribution of the property belonging to a parish or religious society, like the one which is the subject of this proceeding, could rightfully be made among its members. If we should exercise the power to decree a dissolution, we do not see how the provision of the statute directing the distribution of the corporate property could be carried out. No rule or method of distribution is prescribed; none results or could be deduced from the constitution or organization of the corporation. How could the division of it among the members be regulated? Should it be according to the original appraised value of the pews, or the price paid for them by their respective owners, or proportionably according to the number of pews owned by each, or equally among all the members? But if this difficulty could be overcome, there would still remain the insuperable obstacle that the corporate property is devoted to a special use, and cannot be divided among the members without a palpable violation of the trust on which it is held. The statute makes no provision by virtue of which any new rights are conferred on members or their interests in corporate property are enlarged as a consequence of a decree dissolving a corporation. The statute merely recognizes and declares their right to share in the residue, if according to the original constitution of the corporation they are justly entitled to receive it. No provision is made for the disposition of the proceeds in cases where the members have no legal or equitable right to a distribution of them for their own use. But the whole statute was designed to be administered together as a system. All of its provisions are made applicable to the corporations which are embraced within its purview. When, therefore, it is apparent that it is impracticable to apply some of its provisions to certain classes of corporations, it follows that these were not intended to be included within its enactments.

A suggestion was made in behalf of the petitioners that by Gen. Sts. *c.* 30, § 1, all parishes and religious societies are expressly clothed with all the powers given to corporate bodies in *c.* 68, and that these include the right to apply for a dissolution of the corporations under §§ 35–39 of the latter chapter. Passing

by the question whether a right given to members to apply for a dissolution can be properly considered a corporate power, the answer to the suggestion is, that by investing parishes with the general powers of corporations in *c.* 68, it was not intended to provide that they should be authorized to exercise every power therein specified, however incongruous or inapplicable to their constitution or organization some of the provisions might be The statute is to be construed *secundum subjectam materiam,* and those provisions only are to be held applicable to the different kinds of corporations which are adapted to their respective conditions and organizations, and which are capable of being carried into practical effect. So construed, for the reasons already given, the provisions for the dissolution of corporations cannot be held to apply to parishes or religious societies organized and established in the manner in which the corporation which is the subject of these proceedings is shown to have been constituted, and which hold their property on a like tenure. We do not mean to be understood as expressing an opinion that the majority of the members of such corporations may not dispose of their corporate property for the purpose of removing their place of worship, or for repairing or rebuilding their church edifice, or for the payment of their just debts, or for any other similar purpose. Expenditures for these objects may be deemed to come within the range of their legitimate powers and duties, for which their property may be disposed of consistently with the trusts on which it is held. But we do intend to say that this power of disposition does not extend so as to authorize a sale of the entire parochial property with a design to pervert and destroy the trusts on which it is held, and to appropriate it to the private and personal use of the members. Taking this view of the powers and duties of such corporations, and construing the statutes with reference to them, we are constrained to say that we do not feel authorized to exercise the jurisdiction which the petitioners invoke as the foundation of the present proceeding.

But, if we are wrong in this conclusion, we are all clear in the opinion that, assuming that the court has power to grant the prayer of the petitioners, no sufficient cause has been shown for

its exercise. The ground of this opinion has been already indicated by the exposition we have given of the nature and character of the corporation to which the petitioners belong, of the tenure by which it holds its property, and the relations which its members sustain towards the corporate body. It is to be borne in mind that the petitioners do not seek a dissolution of the corporation with a view to a transfer of the trusts to other persons or another corporation, nor do they ask for a sale of the property in order to subserve any purpose for which it is now held by the parish. The prayer of the petition is that the corporation may be dissolved, a receiver of its property and assets be appointed with authority to sell the real estate of the corporation, and, after payment of the corporate debts, to decree a distribution of the surplus "to and among the several members of the corporation, according to their legal interest therein." It is also to be remembered that a considerable portion of the property of the corporation consists of the real estate on which the church edifice now stands, and which was conveyed to trustees by the town of Boston for the uses and purposes already stated. This petition, therefore, is in effect an application to this court to deprive a trustee of the legal capacity to hold the trust property; to vacate and annul a trust created for parish and religious uses, intended by its founders to be permanent, in the due administration of which the public have an interest, and over which no power of absolute control is vested in the *cestuis que trust,* and to take possession of the entire trust estate and divert it from the purposes to which it was appropriated by the donors and founders of the trust, to the private pecuniary advantage of those who have only a qualified and limited interest in it as *cestuis que trust.* It is hardly necessary to say that an application designed to effect these objects, addressed to a court exercising chancery powers, whose peculiar province it is to guard and protect trusts, and to see that they are faithfully executed and administered, if it could be granted at all, would require the most cogent reasons, establishing the inexpediency or impracticability of a further successful continuance or administration of the trusts, to warrant a decree in compliance with the prayer of the

petitioners. But an examination of the averments and proofs offered in support of the petition does not lead to any such conclusion. Giving them full force and effect, all that is made to appear is that the number of proprietors and of worshippers hiring pews in the meeting-house has become greatly reduced; that the corporation has incurred a debt of a considerable amount, which it has no available means to pay; that its necessary expenditures for the support of public worship exceed its income; that the church edifice is out of repair, and will require an outlay of money to put it in a convenient and safe condition, and that there is no probability that, if repaired, it could hereafter be advantageously used for public worship. But these facts, while they tend to establish the present unprosperous condition of the parish, and the inexpediency of continuing to occupy the present church edifice as a place of public worship, do not show that it is either impracticable or inexpedient for the corporation to discharge the powers and duties devolved upon it, or that the execution of the trusts with which it is charged cannot be successfully continued. If the application before us was to grant leave to the corporation to sell the trust property with a view to its appropriation in another locality to the uses and purposes for which it was originally given and dedicated, the facts in evidence would make out a strong case for the exercise of the discretion vested in this court. But the object of the present proceeding is a very different one. It is to destroy the trust, not to enable the trustees to administer it with greater efficiency and success. Looking at the main purpose which it was the design of the founders of the society to accomplish and perpetuate, we cannot see that is not still within the power of the corporation to effectuate it. The chief object of the trust was to support and maintain the public worship of God in the town of Boston. The acquisition of property and the erection of a church edifice were incidental to this main purpose. There is nothing in the original constitution of the corporation, or in the subsequent act of the legislature declaring and affirming its rights and privileges, which absolutely and permanently fixes the locality in which public worship is to be conducted, or which

requires that the corporation should continue to maintain it in the place where the meeting-house is now situated. Doubtless the original and primary intention of the founders of the parish, and of the town of Boston, was that the land granted by the latter should be improved for this purpose; but we fail to see anything to indicate a design to make the continuance of the trust dependent on the perpetual use of that particular site or locality for a house of worship. Nor can any such inference be reasonably made from the facts disclosed concerning the origin and history of the parish. Certainly we cannot suppose that the design of the founders and early members of the society was, that the public worship of God and the maintenance and support of religious ordinances by the association which they established should cease whenever it became inconvenient or impracticable to continue them in the precise locality where the church edifice was first erected. If, as was intimated by the counsel for the petitioners, and as the evidence offered at the hearing tended to prove, the present unprosperous condition of the society arises from the fact that the church edifice is situated in a part of the city which, in consequence of the increased accommodations required for places of business, has ceased to be improved for dwellings, the ability of the corporation to continue in the successful exercise of its proper functions may probably be restored by a removal of the house of worship to another part of the city, where, under a faithful administration of the trusts reposed in the corporation, the public worship of God may be continued according to the intent of the original founders and benefactors of the parish. For a removal of the house under such circumstances, the statutes of the Commonwealth, already cited, make ample provisions, of which the petitioners can avail themselves if they think proper to do so. The petitioners do not allege, nor does the evidence tend to show, that such removal would not have the effect to restore the prosperity of the society and enable the corporation to administer the trust with fidelity and success, by appropriating the property to the uses to which it was originally devoted.

The burden rests on the petitioners to make out a clear case

of the inexpediency and impracticability of a longer continuance of the trusts which are vested in the corporation, in order to enable them to ask that its existence should be terminated and the property diverted to other uses. This burden the petitioners have failed to sustain. Whether, in any state of facts, it would be reasonable or consistent with the principles by which a court of equity is governed to pass a decree that property held in trust by a corporation for pious and religious uses should be converted to the private use and profit of its members, we need not now determine. But we are unanimous in the opinion, for the reasons we have stated, that, if we had the power, it would be most unreasonable for us, on the facts disclosed at the hearing, at the request of a majority of the members and against the protest of a minority, to sanction the destruction of trusts reposed in the corporation which is the subject of this proceeding, and pervert the property from the uses to which it was dedicated by the pious founders of the parish.

*Petition dismissed.*